272 So.2d 746 (1972)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS, Plaintiff-Appellant,
v.
John L. SMITH et ux., Defendants-Appellees.
No. 3929.
Court of Appeal of Louisiana, Third Circuit.
September 19, 1972.
*747 Johnie E. Branch, Jr., Baton Rouge, for plaintiff-appellant.
William E. Skye, Edward E. Roberts, Jr., Alexandria, for defendants-appellees.
Before FRUGE, HOOD and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
The plaintiff Highway Department expropriated 1.981 acres of defendants' 17.142 acre tract, taking all of their highway frontage along Louisiana Highway 1 to a depth of approximately 116.5 feet. The tract taken contained certain improvements, including a nightclub and a residence, stipulated by counsel to be worth $40,811.00.
Pursuant to court order, the plaintiff deposited the sum of $56,346.00 into the registry of court upon filing its suit. That sum was withdrawn by the defendants, who filed an answer asserting that they were entitled to the sum of $111,481.00, representing the value of the property taken, plus $2,943.00 in severance damages.
The case went to trial in that posture and ended in a judgment in favor of defendants in the sum of $47,478.00, representing a market value of the land and improvements of $103,824.00, less the amount already withdrawn by them from the registry of court, $56,346.00. The judgment included the sum of $49,290.00 for the improvements taken, which the parties had stipulated to be worth $40,811.00. This was an inadvertent error on the part of the trial judge, who used the higher figure, representing all of the improvements on defendants' land, whereas he should have used the lower figure, representing only those improvements actually taken. Accordingly, we shall reduce that portion of the judgment representing the improvements to the stipulated sum of $40,811.00. We turn now to an examination of the value of the land, as the trial court's conclusion with regard thereto was appealed by both plaintiff and defendants.
Each side qualified two expert witnesses to testify on its behalf regarding the value of the land. The state, in addition placed in evidence the written reports of its two experts, Darrel V. Willet and T. J. Toups, although only Mr. Willet actually testified on the question of value. The defendants offered the testimony of Habeeb Monsur, Jr., and it was stipulated that had they called their second expert, W. C. Webb, his testimony would not have differed from that of Monsur. All of the appraisers agreed that the highest and best use of defendants' land to a depth of 200 feet, which included the portion taken, was commercial. Beyond that it was agreed that the highest and best use was agricultural and transitional residential.
At the request of plaintiff, its appraisers employed three distinct methods of arriving at a valuation. The first of these was the average land basis, which involves a determination of the average per acre value of all of defendants' land and the multiplication of the acreage taken by the determined value per acre. The second was the contributory value basis which is arrived at by deducting the value of the and remaining after the expropriation from the value of the entire tract before the expropriation and then adding an amount commensurate with the benefits that the remaining land will receive as a result of the new construction. The final method, and the one used by the trial judge in reaching his decision, was what is commonly known as the front land-rear land approach. This method recognizes that land fronting on a public highway is more valuable on the market than land not having such frontage and assesses the value accordingly. The basic legal question before *748 us is whether the trial court erred in selecting this last approach, from amongst those employed by plaintiff's experts, for averaging with the value offered by defendants' experts.
The property expropriated in this case was taken under the provisions of the "Quick Taking Statute" (LSA-R.S. 48:441-460) which, in relevant part, provides that the measure of compensation (market value) is to be determined as in general expropriation suits. LSA-R.S. 48:453. We find the general basis for determining the value of expropriated property expressed in LSA-R.S. 19:9 as follows:
In estimating the value of the property to be expropriated, the basis of assessment shall be the value which the property possessed before the contemplated improvement was proposed, without deducting therefrom any amount for the benefit derived by the owner from the contemplated improvement or work.
To the same effect, see La.Civil Code Art. 2633.
The rules set out in that statute have long been recognized by, and indeed formed, the jurisprudence of this court. In State, Department of Highways v. Landry, La.App., 171 So.2d 779; writ refused, 247 La. 676, 173 So.2d 541, we stated that:
... For, in general, the market value of the particular portion of a tract expropriated is determined by the actual market value of the portion taken, not by its average per-acre value as a pro rata portion of the parent tract.

. . . . . .
We regard the proposition as settled by Louisiana jurisprudence and statute, therefore, that landowners are entitled to receive the full and actual market value of highway frontage expropriated for further highway purposes, without deduction therefrom because a new highway frontage will be provided, by reason of the taking, for formerly-rear portions of the parent tract. To allow such a deduction from the market value of the property taken, would be to allow deduction from this value for benefits which will be derived because of the contemplated improvement for which the expropriation was made, in direct contravention of LSA-R.S. 19:9, the legislative provision forbidding landowners from being deprived for such reason of the true market value of their property which is expropriated for public purposes.
Writs were denied by our Supreme Court in the Landry case with the statement that, "On the facts found by the Court of Appeal there appears no error of law in its judgment." Landry, supra.
The position espoused in Landry was reiterated in State, Department of Highways v. LeDoux, La.App., 184 So.2d 604, wherein we said:
We consider the Louisiana jurisprudence to be settled, therefore, that generally the market value of the particular part of a tract expropriated is determined by the actual market value of the portion taken, and not by its average peracre or square-foot value as a pro rata portion of the parent tract. Also, a landowner is entitled to receive the full and actual market value of highway frontage expropriated for further highway purposes, without deduction therefrom because of the fact that by reason of the taking a new highway frontage will be provided for formerly rear portions of the parent tract.
In their excellent work on the subject, Eminent Domain in Louisiana, Professors Melvin G. Dakin and Michael R. Klein recognize the jurisprudence, of which the above cited cases are part, on page 173, as follows:
... When there is a partial taking and the land expropriated has a different highest and best use than the remainder of the landowner's tract, it appears that the courts will value the land taken separately from the remainder on the *749 basis of its own highest and best use and will not consider the value of the land taken in relation to the whole tract.71
71 Columbia Gulf Transmission Co. v. Fontenot, 187 So.2d 455 (La.Ct.App. 1966); State v. LeDoux, 184 So.2d 604 (La.Ct.App.1966); State v. Bertrand, 184 So.2d 611 (La.Ct.App.1966); State v. Landry, 171 So.2d 779 (La.Ct. App.1965), writ refused, 247 La. 676, 173 So.2d 541 (1965); State v. Waterbury, 171 So.2d 790 (La.Ct.App.1965); State v. Caillier, 157 So.2d 274 (La.Ct. App.1963), writ refused, 245 La. 572, 159 So.2d 285 (1964); Colonial Pipeline Co. v. Babineaux, 154 So.2d 594 (La.Ct.App.1963): State v. Moyse, 151 So.2d 149 (La.Ct.App.1963); Texas Gas Transmission Corp. v. C. M. Thibodeaux Co., 148 So.2d 337 (La.Ct.App. 1962).
We see, then, that the front landrear land concept of awarding compensation is so well entrenched in both the statutory and jurisprudential law of Louisiana that in cases where it becomes the appropriate tool it may be used. This being a proper case for its application, the trial judge did not err in relying upon those estimates of value based on its principles.
Plaintiff cites two cases wherein this court recently elected not to employ the front land-rear land concept. These are State, Department of Highways v. Medica, La.App., 257 So.2d 450; and State, Department of Highways v. Monsur, La.App., 258 So.2d 162; Writ refused, 261 La. 463, 259 So.2d 914. Writs were denied in the latter case by our Supreme Court on the basis that, "... the result is correct." Three justices dissented from the denial of writs.
At no time has this court, or to our knowledge any other court of this state, said that the front land-rear land approach must be used exclusively. All that the statutes and jurisprudence require, as above pointed out, is that the landowner be paid just compensation for the land actually taken, and without considering any benefits that he might derive from the new construction. This certainly does not rule out the use of methods other than the front land-rear land approach to the determination of just compensation in such other cases as make their use more desirable. On the other hand, neither does it rule out the use of that method in cases, such as the one before us, that readily lend themselves to its application.
In the case at bar the landowners were using the portion of their property fronting on Louisiana Highway 1 for commercial purposes, admittedly its highest and best use, in that they maintained a lounge or nightclub thereon. All of their property fronting on the said highway was taken by plaintiff. Neither of those conditions existed in either the Medica or the Monsur cases, supra, and for that and the other reasons advanced in the foregoing paragraphs, we do not now follow the dicta contained in Medica. Rather, we follow the well settled jurisprudence of this court, and reject plaintiff's contention that the trial court erred in assessing a higher value to that portion of defendants' land fronting on the highway, and thereby considering only the highest of the three estimates made by its appraisers.
Likewise we cannot accede to the contention urged by both parties, that the trial court erred in averaging the estimates of plaintiff's experts with those of defendants' experts to reach a conclusion regarding the market value of the property taken. Each of the appraisers who testified referred to a number of comparable sales, or as Mr. Monsur perhaps more accurately chooses to call them, "value indicators", in presenting his opinions. Each of those appraisers adjusted the prices paid in his chosen comparable sales to reflect the differences between them and the subject property.
The trial judge was obviously impressed with the capability, expertise, and sincerity of the appraisers, with each of whom he was well acquainted. He evidently determined that their testimony was entitled to equal weight, and this he had a *750 right to do. Having so decided, it was not error for him to average the valuations placed on the land by the various experts to determine its market value. Louisiana Power and Light Company v. Gaupp, 255 La. 563, 232 So.2d 273.
The final issue involves the expert witness fees fixed by the trial judge for defendants' witnesses. He fixed their fees at $750.00 for preparation and consultation, and $75.00 for their courtroom appearances, for a total of $825.00 each. The fixing of expert witness fees in such cases is a matter resting mainly within the sound discretion of the trial court. Columbia Gulf Transmission Co. v. Fontenot, La. App., 187 So.2d 455, writs refused, 249 La. 717, 190 So.2d 234. We find no abuse of that discretion here, and accordingly the awards will be maintained.
For the above and foregoing reasons, the judgment of the district court is amended so as to reduce it from the sum of $47,478.00 to the sum of $38,999.00 and as thus amended is affirmed. Costs of this appeal are assessed against plaintiff-appellant.
Amended and affirmed.
HOOD, J., dissents and assigns written reasons.
HOOD, Judge (dissenting).
I am unable to agree with my colleagues that the front land-rear land concept of awarding compensation is consistent with the letter or spirit of our expropriation laws, or that it is fair to either the landowner or to the expropriating authority.
The constitution of Louisiana provides that "... private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid." La.Const., Art. 1, Sec. 2; see also La.Const., Art. 4, Sec. 15.
The "just and adequate" compensation to which an owner of property taken in expropriation proceedings is entitled is the full and perfect equivalent of the property taken, that is, the loss caused the owner by the taking, so that the owner shall be put in as good position pecuniarily as he would have been if the property had not been taken. Louisiana Power & Light Company v. Greenwald, 188 So.2d 618 (La.App. 2 Cir. 1966), writs refused 249 La. 740, 190 So.2d 243 (1966); Housing Authority of Shreveport v. Green, 200 La. 463, 8 So.2d 295 (1942); State v. Barrow, 238 La. 887, 116 So.2d 703 (1959); State, Through Department of Highways v. Stoer, 133 So.2d 851 (La.App. 2 Cir. 1961); State, Department of Highways v. Poulan, 160 So.2d 387 (La.App. 2 Cir. 1964). See also 7 UCLA Law Review 795 (1960), Eminent Domain: Compensation for Appropriated Property: Restricted Use as Affecting Compensation.
In Gulf States Utilities Company v. Norman, 183 So.2d 421 (La.App. 3 Cir. 1966), we said:
"The basic purpose in all cases, however, is to determine the just and adequate compensation required by our constitution. Whatever approach or formula of valuation used, it should take into consideration `all factors which lead to a replacement of the loss caused by the taking. This means substantially that the owner is placed in as good a position pecuniarily as he would have been had his property not been taken.'" (Emphasis added).
The United States Supreme Court said in Bauman v. Ross, 167 U.S. 548, 574, 17 S.Ct. 966, 976, 42 L.Ed. 270 (1897):
"The just compensation required by the constitution to be made to the owner is to be measured by the loss caused to him by the appropriation. He is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public." (Emphasis added).
The rule stated in these cases is applied in all other states, and it has been applied *751 generally in this state, except in a few cases, including the instant suit, where the so called "front land-rear land rule" was applied. In my opinion the rule set out in the cited cases should be applied in all expropriation suits in such a manner that it will mean what it says. The landowner should be placed in as good a position pecuniarily as he would have been had his property not been taken. He should not be placed in a worse position, but neither should he receive a windfall or be placed in a much better position pecuniarily than he would have been had his property not been expropriated.
The "front land-rear land rule," which the majority has applied in the instant suit, is the progeny of the recent decision which our court rendered in State, Department of Highways v. Landry, 171 So.2d 779 (La. App. 3 Cir. 1965). Under that rule the front land, that is, the part of the property fronting on the highway, and extending back an arbitrarily fixed distance, is given a higher value because of its access to the highway, and the rear land is valued at a much lower figure. When the property is taken for the purpose of widening and improving the highway, the landowner is awarded the high front land value, a substantial part of which is for the right of access, although he never loses his right of access. I feel that that rule is wrong in principle and in law, and that rarely, if ever, can it operate to place the landowner in substantially the same position pecuniarily as he would have been had his property not been taken. Under such a rule the landowner will receive either too much or too little for his property. It would be pure accident, if, by chance, he should receive just and adequate compensation for the property taken.
I believe that the rule commonly known as the "average land basis rule" should be applied here. Under that rule, each part of the parent tract which has the same physical characteristics is appraised separately, and the landowner is awarded the value of the property taken, based on the average per acre (or square foot or some other unit) value of the class or classes of land included in the taking. In addition to the value of the property taken, the landowner also is awarded the severance damages to his remaining property resulting from the taking or from the construction of the improvements. That rule was followed consistently in Louisiana before Landry, and it was applied more recently in State, Department of Highways v. Medica, 257 So. 2d 450 (La.App. 3 Cir. 1972); and State, Department of Highways v. Monsur, 258 So.2d 162 (La.App. 3 Cir. 1972). The rule was stated in Medica as follows:
"In expropriation suits, where the property affected is composed of different classes of land, with each class having different physical characteristics, each such class may be appraised separately, and the value of the property taken may be computed on the basis of the appraisals made of the various classes of property. Where the affected property is not composed of different classes of land, however, then it should be appraised as a unit, or on a per acre or square foot basis, and if there is a partial taking the value of the part taken should bear the same proportion to the total value as the area taken bears to the total area included in the parent tract. If the remaining property sustains a decrease in value as a result of the taking, of course, the owner is entitled to severance damages in addition to the value of the property taken."
In the instant suit the Highway Department expropriated 1.981 acres of defendants' 17.142 acre tract. Prior to the taking the parent tract had a frontage of 752.92 feet on Highway One, with an average depth of 991.7 feet. The part taken is a strip across the front of the parent tract, extending from the highway to an average depth of about 116.5 feet. The property expropriated is to be used to widen the highway, and to improve it by converting it from a two-lane black-topped road to a divided four-lane concrete thoroughfare.
*752 Defendants will continue to have free access to the widened and improved highway, just as they did to the old one before the property was taken.
The two appraisers called by the Highway Department appraised the parent tract before the taking, exclusive of improvements, at $96,995.00, and $90,853.00, respectively. Using the higher figure, this amounts to an average value of $5658.00 per acre for the entire tract, or a value of $11,208.50 for the part taken.
The two appraisers called by defendants did not value the parent tract as a whole. Instead, they divided the property into two partsthe "front land" and the "rear land." They appraised the front land, that is, the part of the parent tract which fronted on the highway and extended rearward to a depth of 200 feet, at $82,819.00, and they valued the remaining property, the rear land, at $6,000.00 per acre. This amounts to an appraisal of $164,971.00 for the entire 17.142 acre parent tract before the taking, or an average of $9,623.79 per acre. They appraised the 1.981 acres of land which was taken, all of which was considered to be front land, at $67,671.00, or $34,160.00 per acre.
According to my figures, the property which defendants' appraisers considered to be front land (to a depth of 200 feet) comprised a total of 3.45 acres, and they valued that front land at an average of $24,005.51 per acre. I have already shown that they valued the front 116.5 feet of the "front land" at $34,160.00 per acre. It appears, therefore, that defendant's appraisers actually considered the "optimum" or "ideal" depth of the property to be 116.5 feet, rather than 200 feet, or that the value per acre or unit goes up progressively as the depth is reduced.
The trial judge, applying the "front landrear land rule," awarded defendants the sum of $54,534.00 for the 1.981 acre strip of land taken, exclusive of improvements. This amounts to an award of $27,124.00 per acre for the property expropriated. The additional sum of $49,290.00 was awarded for the improvements taken. My colleagues have reduced the award for improvements to $40,811.00, but they have affirmed the award for the value of the land taken.
After this taking and the construction of the new highway, defendants will be left with a tract of land comprising a total of 15.161 acres, fronting on a new four-lane concrete highway. They will still have their front land, with the same highway frontage they had before, and with the same free access to the new highway as they had to the old one. They can extend their remaining front land to an arbitrary depth of 200 feet, or to any other depth which they consider to be optimum or ideal. The only thing they have lost as a result of the taking is a little of their "rear land." The parent tract extended from the old highway to an average depth of 991.7 feet, whereas their remaining property extends to an average depth of 875.2 feet from the new highway. If the front 200 feet is set apart as being "front land," then before the taking defendants' "rear land" had a depth of 791.7 feet, and after the taking their rear land had a depth of 675.2 feet. They now have exactly 1.981 acres less rear land than they had before. The highest value placed by any appraiser on the rear land was $6,000.00 per acre, and yet defendants have been awarded $27,124.00 per acre for the 1.981 acres of land which they have lost. Defendants, thus, have received a windfall in this case. They are in a much better position pecuniarily than they were before the property was taken, at the expense of the public, contrary to the above cited established principles of law.
One author has stated, appropriately, that "where the extent of the loss cannot be measured by the usual standard of `fair market value' without a resulting windfall to one of the parties, some other standard of valuation should be applied." 7 UCLA Law Review 797.
The error which my colleagues have made, I think, is that they have included in *753 the award, and have compelled the Department of Highways to pay to defendants, a sum of money as damages for loss of access to the highway, whereas defendants in fact have never lost their access to the highway, and they thus have suffered no such damage.
The evidence shows that the entire parent tract had uniform physical features and characteristics, and that there was no reason other than access to the highway, for appraising one part of the property at a higher figure than another part. The only reason assigned by defendants' appraisers, and by my colleagues, for giving a higher value to the "front land" than was given to the "rear land" was that the front land had access to the abutting highway. The part of the "front land" which was taken was appraised at $34,160.00 per acre solely because it had access to the abutting highway. The "rear land" was appraised at only $6,000.00 per acre because it did not have access to the highway. The difference between those two figures, amounting to $28,160.00 per acre, or $55,784.96, is the value which defendants' appraisers placed on the "right of access." This is obvious, because if access to the parent tract should have been destroyed by the erection of barricades or by the abandoning of the highway, then the part of the property which formerly was "front land" would have no more value than the so-called "rear land."
My colleagues did not award defendants as much as the latters' appraisers said the property taken was worth, but they did award them $54,534.00 for the 1.981 acres taken. The highest value placed on that property by any appraiser, without adding in the value of access, was $6,000.00 per acre, or $11,886.00. The majority thus determined that the value of the "right of access" to the property taken was at least the difference between those two figures, or $42,648.00. They have awarded defendants at least that amount, $42,648.00, as the value of the right of access, in addition to the value of the land, although defendants never lost their right of access.
There are many factors or circumstances which affect and play some part in determining the value of a tract of land. Some of them are inherent features of the land itself, such as its elevation, soil quality, trees and drainage. Others are extrinsic features, such as the proximity of the land to a municipality or an airport, zoning regulations, the purposes for which neighboring property is used and the economic growth or stability of the area. Although these extrinsic features affect the value of the land, the landowner does not own them, and he is not entitled to be compensated if he loses them. Where the land abuts an existing street or highway, however, serious questions have been presented as to whether the landowner acquires a "right of access" to and from that thoroughfare, and, if so, whether he is entitled to be compensated if that right of access is taken from him.
The origin of the concept of access as a right of an abutting property owner is somewhat obscure. Bacich v. Board of Control of California, 23 Cal.2d 343, 144 P.2d 818 (1943). Several authors point to specific cases which they feel originated the concept of access as a right.[1] Most often cited are the New York Railway cases: Story v. New York Elevated R. R., 90 N.Y. 122 (1882); Lohr v. Metropolitan Elevated R. Co., 104 N.Y. 268, 10 N.E. 528 *754 (1887); Kane v. Metropolitan El. Ry. Co., 125 N.Y. 164, 26 N.E. 278 (1891).[2]
Regardless of the origin of this concept, however, the great weight of authority in the United States today is that an abutting property owner's right of access to an existing public street or highway is a private property right, and that once he has acquired that right he ordinarily cannot be deprived of it without just compensation. 25 Am.Jur. Highway, Sec. 154, page 448. See also Jones Island Realty Company v. Middendorf, supra; State v. Department of Highways, supra; English Realty Co. v. Meyer, 228 La. 423, 82 So.2d 698 (1955); Cucurullo v. City of New Orleans, 229 La. 463, 86 So.2d 103 (1956); State v. O'Neal, 149 So.2d 421 (La.App. 3 Cir. 1963).
In Donovan v. Pennsylvania Company, 199 U.S. 279, 302, 26 S.Ct. 91, 98, 50 L.Ed. 192 (1905), the Supreme Court said:
"The general doctrine is correctly stated in Dillon on Municipal Corporations: `For example, an abutting owner's right of access to and from the street, subject only to legitimate public regulation, is as much his property as his right to the soil within his boundary lines.... When he is deprived of such right of access, or of any other easement connected with the use and enjoyment of his property, other than by the exercise of legitimate public regulation, he is deprived of his property.'"
The right of access is an incorporeal property right which arises solely because the property abuts the street or road. It consists of an abutting owner's right of reasonable egress from his property to the general system of streets and roads, reasonable ingress to his property from the same system of streets and roads, and his right that his friends and customers have the same reasonable ingress and egress. 12 South Carolina Law Quarterly 377 (1960), supra; 56 Northwestern University Law Review 587 (1961), supra; 33 Oregon Law Review 16 (1953), supra; Washington University Law Quarterly 310 (1959), supra.
This right of access does not attach to a specific street or road, but rather it consists of the property owner's right of reasonable access to the general system of streets and roads. If the property abuts on an existing road, thus providing ready and easy access to the general system of streets and roads, then the jurisprudence seems to be that the landowner has the right to continue to have ready ingress and *755 egress to the general system of roads, and he is entitled to recover damages if the taking results in the loss or impairment of reasonable access to his remaining property.
Before the concept of "right of access" developed, cases arose where the construction of street improvements resulted in the complete loss or destruction of access of an abutting tract of land to the street, although no part of the abutting property was taken. This occurred when streets were elevated or lowered to such an extent that access to the abutting property became impossible, or where no-access highways were constructed. Initially in those cases the courts held that the owner of the adjacent property could not recover anything as a result of his loss of access. Property was conceived to be a corporeal commodity, and a "taking" denoted a physical invasion of the commodity. Since no property had been taken, the courts reasoned that no award could be made to the landowner. 33 Oregon Law Review 25-27, 30 (1953), supra; 47 Texas Law Review 734-737 (1969), supra.
Later, after the right of access had been recognized as an incorporeal property right, some courts made awards to owners of abutting property on the theory that an incorporeal property right had been taken, and there thus had been a "taking." That view, however, totally ignored the appurtenant nature of the right of access, and as a result the intangible nature of the right complicated judicial efforts to determine if a taking had occurred. Often when a court declared that no compensation was due for the loss or impairment of access, it was difficult to ascertain whether the court had decided that access was not property, or that the governmental action did not constitute a taking. 47 Texas Law Review 734-737 (1969), supra. See also 12 South Carolina Law Review Quarterly 377 (1960), supra.
Eventually, many states amended their expropriation laws to allow compensation for the damaging, as well as for the taking, of private property. With these provisions, courts began to award compensation to the abutting property owner for the loss or impairment of access, whether or not there had been a partial taking. Such awards, however, were made on the basis that the landowner's remaining property (or his entire tract if there was not a partial taking) had been damaged by the loss, destruction or impairment of reasonable access. The courts reasoned that since damages could be recovered for loss of access without a taking, severance damages to the remaining property could be recovered where there had been a partial taking. 8 Utah Law Review 24 (1962)The Limited-Access Highway, Some Aspects of Compensation; 33 Oregon Law Review 26 (1953), supra; 3 Willamette Law Journal 52 (1964)Limited-Access Highways, Rights of Abutting Landowners. These decisions gave proper recognition to the appurtenant character of the right of access. The concept of awarding "damage" for loss or impairment of access, rather than attempting to award the market value of a right of access under the theory that it is being taken, provides a more certain guide for assuring the property owner and the expropriating authority that just and adequate compensation will be awarded.
In Gilmore v. State, 208 Misc. 427, 143 N.Y.S.2d 873 (Ct.Cl.1955), the court said:
"... the right of claimants as such property owners to compensation is measured and ascertained not by the value of the easements separate and without reference to the dominant tenement to which they are attached, but by the damage which the dominant tenement sustained as a result and as a consequence of their loss. It follows that in making an award where easements are taken or interfered with to such an extent that in a legal sense they are taken, there would be no compensation for the easements taken beyond a nominal sum, and the right of claimants to recover would rest chiefly upon proof of consequential damages; that is, the real injury, if any, suffered by the landowner in any particular *756 case of the appropriation of property in the form of an easement lies in the effect produced upon the land to which the easement appropriated was appurtenant." (Emphasis added).
Louisiana recognized early that the right of access, once established, becomes a property right, and that the abutting property owner is entitled to be compensated for loss or impairment of that right. The courts were uniform in holding, however, that compensation for the loss or impairment of access would be made only as severance damages to the remaining property, where there has been a partial taking, or as damages to the entire tract where no part of the abutting property was taken. The loss or impairment of access was never awarded as an element of the value of the property taken, until the so-called "front land-rear land rule" was conceived and applied in a few recent cases.
Prior to the constitution of 1879, the organic law of this state, like that of all other states, simply provided that "private property shall not be taken for public purposes without adequate compensation." Under this rule, a taking of the property was a condition precedent to liability, and the sole measure of compensation due was the value of the property taken. Mere consequential damage to property, when the property itself was not taken, was not recoverable, and much less any damages resulting to individual owners, including loss or impairment of access. McMahon v. St. Louis, A. & T. R. Co., 41 La.Ann. 827, 6 So. 640 (1889).
The provision which first extended our law to compensate damages to property sustained by reason of public usage was incorporated in the Constitution of 1879, article 156. It was subsequently retained in the succeeding constitutions of 1898, 1913 and 1921. Prior to inclusion in a Louisiana constitution, the same principle was enunciated in article 545 of the Code Napolean, which provided that no one can be compelled to part with his property unless by reason of public utility and on consideration of an equitable and previous indemnification. This article was incorporated in the Civil Codes of 1808, 1825 and 1870. LSA-C.C. art. 497; Britt v. City of Shreveport, 83 So.2d 476 (La.App. 2 Cir. 1955); Griffin v. Shreveport and A. R. Co., 41 La.Ann. 808, 6 So. 624 (1889); Jarnagin v. Louisiana Highway Commission, 5 So.2d 660 (La.App. 2 Cir. 1942); State, Through Department of Highways v. Terry, 194 So. 2d 144 (La.App. 1 Cir. 1967).
Our Supreme Court said in Cucurullo v. City of New Orleans, supra:
"Unquestionably, plaintiff's premises were damaged by the complete and permanent elimination of the driveway. Even appellant's experts testified that the loss of the driveway resulted in a diminution in the rental and sale value of the property.

"Moreover, the city, having caused the loss in connection with and necessitated by its construction of public works is legally liable therefor. Section 2, Article 1 of the Louisiana Constitution, LSA, states: ` * * * Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid.' And our jurisprudence recognizes the liability of public agencies for interfering with right of ingress and egress respecting private properties. Harrison v. Louisiana Highway Commission, 202 La. 345, 11 So.2d 612 and Patin v. City of New Orleans, 223 La. 703, 66 So.2d 616." (Emphasis added).
The same court said in Cerniglia v. City of New Orleans, 234 La. 730, 101 So.2d 218 (1958), that:
"No part of plaintiffs' property was taken; their cause of action is founded on Article 1, Section 2 of the Louisiana Constitution of 1921, providing compensation for damage in cases of expropriation." (Emphasis added).
*757 In Hebert v. State, Department of Highways, 238 So.2d 372 (La.App. 3 Cir. 1970), we said:
"Even though no portion of an owner's property is actually taken, he may recover damages if his ingress and egress are substantially impaired ...".
In Efurd v. City of Shreveport, 235 La. 555, 105 So.2d 219 (1958), the city constructed a viaduct over and along the street which formerly abutted plaintiff's property, with the result that access from plaintiff's property to the street was completely cut off. Plaintiff sued for damages, and our Supreme Court, holding that he was entitled to recover, said:
"It is well settled that when private property is damaged for public purposes, the measure of compensation is the diminution in the market value of the property damaged." (Emphasis added).
The jurisprudence seems to be settled in this state, therefore, that the landowner may be compensated for the loss or impairment of access to an abutting street, but the award for such loss or impairment is made solely as damages. If there is a partial taking, accompanied by the loss of access to the remaining property, then the award for loss of access is made as severance damages to the remaining property. If the construction of public improvements results in destroying the landowner's access, then he may be entitled to recover damages, even though none of his property was taken.
The right of access has no existence, and it has no value apart from the land. It, of course, is valuable to the person who owns the abutting property, but it is of no value to anyone else. No one would buy a right of access to a tract of land which he does not own or cannot use. A right of access cannot be peddled or sold separately from the land on the open market, and thus it has no "market value," as that term is used in expropriation proceedings. Due to this characteristic, the value of access to the landowner is ascertainable only by determining the amount by which it increases the market value of the land to which it attaches. 42 Minnesota Law Review 114 (1957-58), supra; 3 Arizona Law Review 51 (1961)Access Loss Distinguished from Traffic Flow Diversion; 12 South Carolina Law Quarterly 390 (1959-60), supra; 11 Kansas Law Review 392 (1962-63), supra; 3 Stanford Law Review 304 (1957), supra; 3 Willamette Law Journal 56 (1964-65), supra; Britt v. City of Shreveport, supra.
Since a "market value" cannot be assigned to a right of acess, then it logically follows that no award of market value can be made for the "taking" of that right of access. The only award which can be made for the loss or impairment of access is in the nature of damages. The amount of an award of damages for loss of access should be the amount by which the loss diminishes the market value of the land to which it is appurtenant. That is the traditional test for determining severance damage to the landowner's remaining property. In determining severance damages, our courts universally apply the "before and after rule." The damages are computed by determining the value of the remaining property before the taking and its decreased value after the taking. The difference constitutes the severance damages suffered by the owner of the remaining property.
As early as 1887 our Supreme Court said in McMahon v. St. Louis, A. & T. R. Co., supra, that:
"As in the case of a taking the measure of compensation is the value of the property taken, so in the case of damages the measure of compensation is the diminution in the value of the property."
Under the damage provision of our constitution, it is necessary to show special damages peculiar to the property in question, that is, damage of a different kind than that suffered by the general public. This is similar to the requirements in other states. 7 UCLA Law Review 531 (1960), supra; 20 Southwestern Law Journal 393 *758 (1966), supra. Access, however, is a private property right, which is special and individual to each owner. It is not common to the public generally. The destruction or impairment of access thus may cause special damage to the abutting property. Jones Island Realty Company v. Middendorf, supra. When this right of access is destroyed or impaired to the extent that it is rendered unreasonable due to expropriation, the owner is entitled to be compensated for the resulting damage to his remaining property. State v. Department of Highways, 200 La. 409, 8 So.2d 71 (1942).
An important aspect of the definition of the "right of access" is the word "reasonable." The overwhelming weight of authority in the United States is to the effect that an abutting property owner is not entitled to access to and from his land at every point where it joins or touches the highway. He is entitled only to reasonable access from his property to the general system of public streets or highways and back again. 39 Am.Jur.2d, Sec. 178, page 553; 12 South Carolina Law Quarterly 377 (1960), supra; 27 Washington Law Review 125 (1952), supra; 38 Nebraska Law Review 416 (1959), supra.
Our Supreme Court stated in State v. Department of Highways, supra, that:
"... an owner is not entitled, as against the public, to access to his land at all points in the boundary between it and the highway, although entire access cannot be cut off. If he has free and convenient access to his property, and his means of ingress and egress are not substantially interfered with by the public, he has no cause of complaint."
If the landowner had reasonable access before the expropriation, and he continues to have reasonable access after the taking, then he ordinarily is not entitled to be compensated for loss of access, since he suffered no such loss. He had a right of access before, and he continued to have a reasonable right of access after the taking.
The question of whether the landowner is left with "reasonable" access after the taking is a factual issue which must be determined according to the facts of each case. The initial and most difficult issue to resolve is where the police power ends and the power of eminent domain begins.[3] Another question presented is whether the harm suffered by the landowner is merely different in degree, not kind, from that suffered by the general public.[4] An issue frequently presented is whether the landowner is required to travel by a "circuitous route" after the taking in order to reach the general system of roads. Many courts have held that "mere circuity of travel" is non-compensable as an element of damage.[5] Another question is presented where the street improvement results in an alteration of the general traffic flow. A claim that government action has diverted the main stream of traffic away from the abutting land, and that such diversion of traffic has reduced the value of the abutter's premises, has been held generally to be a non-compensable *759 element of damage, the reason being that the traffic flow is not encompassed within the right of access.[6]
The jurisprudence of this state is settled that diversion of traffic flow from one highway to another is not compensable as an element of damages, where access to the premises has not been substantially impaired. Hebert v. State, Department of Highways, 238 So.2d 372 (La.App. 3 Cir. 1970); Patin v. City of New Orleans, 223 La. 703, 66 So.2d 616 (1953); Thomas & Warner, Inc. v. City of New Orleans, 230 La. 1024, 89 So.2d 885 (1956). In Patin v. City of New Orleans, supra, for instance, the court determined that the property of the plaintiff landowners had diminished in value by $10,000.00 as the result of the construction of an overpass. It awarded plaintiffs damages of only $2500.00, however, because it found that three-fourths of the damage was due to "diversion of traffic," which it held to be non-compensable.
In State, Department of Highways v. Hunt, 219 So.2d 602 (La.App. 1 Cir. 1968), a part of defendants' property was expropriated for the construction of a complex limited access highway interchange. Although defendant lost his highway frontage, he was provided with access by means of an abutting service road. The court, in holding that he was not entitled to severance damages for loss of access, said:
"The mere fact that remaining property fronts on a service road rather than a main traffic artery as a result of an expropriation is not per se compensable. State, Through Department of Highways v. Sumrall, La.App., 167 So.2d 503. A landowner may not be awarded damages for lack of direct highway access when he is provided reasonable access after the taking. Inconvenience to the landowner, diversion of traffic or change in attending conditions are not proper elements of severance damages unless they diminish the value of the owner's remaining property."
In the instant suit there has been no loss or impairment of access. There has been no diversion of traffic flow. Defendants still have reasonable access to the abutting highway and to the general system of streets and roads. And, they have suffered no damage at all as the result of the taking and construction of the new highway. The above mentioned issues thus are not presented in this case. I mention them, however, to emphasize the fact that defendants have not suffered any damages at all due to loss of access to the remaining property. Their right of access has not been taken, nor has it been destroyed or impaired. My colleagues have required the Highway Department to pay for something (the right of access) which it did not acquire and which defendants did not convey.
The majority states that the front land-rear land concept of awarding compensation is "well entrenched" in the law of this state. As authority for that statement they quote from Eminent Domain in Louisiana, by Professors Melvin G. Dakin and Michael R. Klein, and they cite nine Louisiana cases.
I find nothing in the quoted statement of Professors Dakin and Klein which indicates that the front land-rear land rule is the law of this state. Neither do the authors say that where there is a partial taking of frontage property, the expropriating authority should be required to pay the landowner for the loss of his "right of access," even though it does not take such a right and the landowner does not lose or suffer an impairment of it. One of the authors, Professor Dakin, expressed views in a later article, which appear to be contrary to those of the majority in this case. In commenting *760 on three cases decided by the Third Circuit Court of Appeal, in which the front land-rear land rule was applied, Professor Dakin said:
"Louisiana has a statute which declares that, in estimating value of property expropriated, it shall be done `without deducting therefrom any amount for the benefit derived by the owner from the contemplated improvement or work.' When applied to the taking of frontage property incident to widening an existing highway, where the property taken is part of a larger tract which will have the same frontage on the newly widened right-of-way, the paradoxical result is reached that the condemnor must pay for taking away a benefit which it immediately reconfers but may nonetheless take no credit therefor against the award. On the other hand, if severance damages are claimed in connection with such a taking, special benefits conferred on the remainder by the improvement may be offset. Thus, the overall compensation could differ as to similar tracts of land depending on the way in which the claim is made. The condemnor sought to temper the results in LeDoux by estimating the award as a pro rata portion of the entire tract valued on an average basis, but the Third Circuit rejected the approach." (Emphasis added). 27 La.L.Rev. 469, 476 (1967).
I do not agree with the author's suggestion that the condemnor has taken away the right of access and has immediately reconferred it to the landlord. I feel that in the instant suit the right of access has never been taken away by the condemnor. Defendants have never lost that right. They still have it. They have never suffered any impairment of it. And, they still have the same amount of front land as they had before the taking. I agree with Professor Dakin, however, in what I consider to be his expressed view that the front land-rear land rule unavoidably leads to some unfair and ridiculous results, and that those results may be made to vary "depending on the way in which the claim is made."
I concede that in three of the nine Louisiana cases cited by my colleagues the front landrear land rule was applied. One of them, of course, is State, Department of Highways v. Landry, supra. The other two are: State, Department of Highways v. LeDoux, 184 So.2d 604 (La.App. 3 Cir. 1966); and State, Department of Highways v. Bertrand, 184 So.2d 611 (La.App. 3 Cir. 1966).[7] Another case cited by them, State, Department of Highways v. Caillier, 157 So.2d 274 (La.App. 3 Cir. 1963), contains language which can be interpreted as approving the principle of the front land rear land rule. Although I do not think the court intended to create such a novel rule of law in that case, I felt at the time that a rehearing should be granted because of the misleading language which had been used. I do not feel that any of the other five cases cited to support the majority's conclusions are applicable here.
*761 Three of the other cases relied on by my colleagues involved expropriation of servitudes for gas pipe lines. Columbia Gulf Transmission Company v. Fontenot, 187 So.2d 455 (La.App. 3 Cir. 1966); Colonial Pipeline Company v. Babineaux, 154 So.2d 594 (La.App. 3 Cir. 1963); and Texas Gas Tranmission Corporation v. C. M. Thibodeaux Company, 148 So.2d 337 (La.App. 1 Cir. 1962). They did not involve a taking of frontage land for highway purposes, and no issue was presented relating to the loss or impairment of the landowner's right of access. The remaining two cases cited by the majority merely support the existing rule that where the parent tract consists of different types of land, having different characteristics, each class may be appraised separately and the awards may be based on those appraisals. In State v. Moyse, 151 So.2d 140 (La.App. 1 Cir. 1963), for instance, the parent tract, comprising 253 acres, consisted of three entirely different classes of property, with different established uses, different shapes and with different zoning restrictions. I find nothing in the opinion which supports the so-called front landrear land rule. The last case, State, Department of Highways v. Waterbury, 171 So.2d 790 (La.App. 3 Cir. 1965), was not a highway widening case. A new four-lane highway, with service roads, was constructed through and across the landowner's 152.6 acre tract of land. All appraisers agreed, and the court found, that the property was best suited for the development of subdivisions, and it was valued as subdivision property, making deductions for development costs. One appraiser prepared a plat of a proposed subdivision of the entire tract, and he valued each lot separately. The court apparently accepted that method of determining the value of the property taken. It applied the settled rule that where the property taken is composed of different classes of land, each class may be valued separately. No issues were presented relating to the loss or impairment of access to any abutting roads.
There, of course, are many cases in Louisiana where the courts have applied the average land basis rule. In all such cases, of course, they also considered and awarded severance damages, where appropriate, in order to insure that the landowner would receive just and adequate compensation and would be placed in the same position pecuniarily as he would have been had his property not been taken. A few of them are: State, Department of Highways v. Barton, 231 So.2d 403 (La.App. 4 Cir. 1970); State v. Hyland, 148 So.2d 886 (La.App. 1 Cir. 1962); State v. Cities Service Refining Corporation, 135 So.2d 636 (La.App. 3 Cir. 1961); State v. Williams, 131 So.2d 600 (La.App. 3 Cir. 1961); State, Department of Highways v. Medica, supra; State, Department of Highways v. Monsur, supra.
In the Barton case, supra, the rear portion of the parent tract was taken. The court rejected an argument that the "rear land" was worth less than the "front land," and it awarded the average per square foot value of the entire tract, stating that "the owners are entitled to compensation on the basis of its proportionate actual value as a part of the whole." In State v. Hyland, supra, the court said:
"... Generally speaking this is not the proper method of evaluating a small tract which is taken from a larger undeveloped tract. It should be valued by considering what value the portion taken bore to the value of the whole tract. Orgel on Valuation under Eminent Domain, Vol. I Second Edition, Section 52, p. 274; Colonial Land Co. Ltd. v. Board of Com'rs of Pontchartrain Levee Dist., 170 La. 1057, 129 So. 635."
In State v. Cities Service Refining Corporation, supra the 120 acre parent tract was divided by an existing blacktop public highway. The 80 acres lying north of that highway was appraised separately from the 40 acres lying south of it, because of the different characteristics of those tracts. The landowner was awarded for each part expropriated the average per acre value of the class of property from which it was *762 taken, even though a part of the property taken fronted on the existing highway. And, in State v. Williams, supra, the Department of Highways took 8.171 acres out of defendants' 120 acre parent tract, which "fronted for three-fourths of a mile along a much-traveled hard-surfaced highway." The parts taken apparently included parts of the "front land." The court found the entire parent tract to have a value of $2,117.00 per acre, and the award made to the landowner was based on that average value.
The cases of State, Department of Highways v. Medica, supra, and State, Department of Highways v. Monsur, supra, involved two adjacent tracts of land. Both tracts were the same size, they had the same characteristics, and they both fronted on the same existing highway. The Highway Department took largely "rear land" out of the Medica tract, and mostly "front land" from the Monsur tract. The trial courts applied the "average land basis rule" in Medica, and the "front landrear land rule" in Monsur. We held that the "average land basis rule" should have been applied in both cases, and accordingly the award to the landowners in Monsur was amended so as to allow them to recover for the property taken the average per acre value of the parent tract.
I agree with the following views which were expressed by the Court of Appeals of Kentucky in Frenel v. Commonwealth, Department of Highways, 361 S.W.2d 280 (Ct. App.Ky.1962):
"We have said on at least two occasions that the value of a tract of land taken by condemnation is to be measured with reference to the entire tract....
"`Frontage' value may be considered nothing more than the value that derives from convenient, direct access to the highway. The right of such access ordinarily is appurtenant to the entire tract, and so long as the tract continues under single ownership it cannot be said that the value attaches to the front portion of the tract any more than to the back. The value from the right of access can attach specifically to the front portion only by a conveyance of the right along with a conveyance of the front portion which results in destroying or lessening the access to the highway from the back portion. But in the ordinary highway widening situation the right of access is not taken by the condemnation and the front portion is not devoted to a use that impairs the access of the back portion on the contrary, it is converted to a use which leaves all of the right of access attaching to the back portion. No part of the right of access is taken along with the front portion, by the condemnation and no new right of access is created for the back portion; the formerly existing right of access simply adheres to the back portion. So no `frontage' value has been taken by the condemnation nor has the value of the remainder of the tract been enhanced by any newly created frontage rights." (Emphasis added).
The Court of Appeals of Arizona observed, correctly I think, in Deer Valley Industrial Park Dev. & L. Company v. State, 5 Ariz.App. 150, 424 P.2d 192 (1967), that:

"It is abundantly clear in cases such as this that a substantial portion of the value of the property in question arises by reason of its right of access to the public road upon which it fronts. In insisting that the two parcels of land taken here should be compared to parcels of land of similar size sold in this area, it is significant that the property owners' appraisers have selected sales of smaller parcels of land which in each case included the frontage rights, which frontage rights pertained to property of substantially less depth than that of the 160 acres involved here. These smaller parcels of land presumably have been separated out of larger parcels of land and sold for their frontage value. When this is done, rights of access attaching to the rear portions of the larger parcels have been separated from their access rights *763 to the highway, in a quid pro quo exchange, so that in effect the buyers have paid additional value for the totality of the access rights of the larger parcels of land. To compare the sale of these smaller parcels to the taking here seems to this court to be completely unrealistic and not within the contemplation of either our constitution or our statutory provisions pertaining to eminent domain.
"... Common sense, derived from experience, leads this court to conclude that our legislature, by adopting the subject rule of damage, A.R.S., § 12-1122, subsec. A, did not intend that property owners be paid in full for valuable frontage rights, and yet at the same time retain these frontage rights." (Emphasis added).
The above authorities show, I think, that the so-called "front landrear land rule" is not "entrenched" in the statutory and jurisprudential law of Louisiana, or of any other state. Aside from the fact that it is not the law, however, there are equitable and practical reasons why it cannot be applied with fairness to the parties.
In the instant suit the majority has determined that the "market value" of the land taken is $54,534.00, or the sum of $27,124.00 per acre. The "market value" found by the court however, is the highest price which the strip of frontage land taken would bring if sold at private sale. If the property being taken here should be sold at private sale, the purchaser would acquire the mineral rights and he would acquire the exclusive right of access. He would have the right to prevent any further access to that property from defendants' remaining land. He could erect fences, barricades or buildings in this strip of land if he saw fit to do so. The value which the appraisers and my colleagues have placed on the land taken thus is its value if sold with all of those rights. In this expropriation, however, the Department of Highways acquires no such right or title. It acquires title to the property subject to the reservation in perpetuity in favor of defendants of all minerals and royalties, and subject to the landowners' right to continue to have free access to the property and to the improved highway which is to be constructed on it.[8]
The Highway Department thus is being required to pay the highest price which a purchaser at private sale would pay for full title to the property. Yet, the Department is acquiring the land subject to the reservation of all minerals and the reservation by the seller-landowner of the right of access. I agree that "market value" is a proper test for an award, but here the market value should be the amount which the property taken would bring if sold subject to the same reservations as are imposed on the Highway Department. I have already pointed out that the highest value which any appraiser put on the property taken without the right of access is $6,000.00 per acre.
In Orgel on Valuation under Eminent Domain (1953), at page 247, the author quotes with approval from City of Grand Rapids v. Barth, 248 Mich. 13, 226 N.W. 690 (1929). In that case the court said:
"... but the appellants claim that they should be paid as damages occasioned by taking the front 16 feet of their respective properties the fair market value obtainable therefor by its sale as a parcel separated from the remaining portion of the property....
"But the rule for which the appellants contend is not the correct rule by which a property owner's damage should be *764 assessed, when only a portion of the parcel is taken. The fallacy in appellants' proposed method of fixing the amount of damages lies in overlooking the fact that widening Fulton street does not deprive their properties of frontage on that street as would a sale of the front sixteen feet for private use. They will still have a right of ingress and egress on Fulton street, and their easement as to light and air on that side will still be pertinent to their properties.
"... If these defendants sold to a private owner the front 16 feet of their lots, the property rights which they would convey to their grantees would be very different and more valuable than the property rights which the city is attempting to take by condemnation, and just compensation or the fair measure of damages is not the same in the one instance as in the other....
"Under the rule of compensation asserted by the appellants, they would not only `be made whole,' but they would profit rather handsomely at the public's expense."
In a case such as the instant suit, when the front landrear land rule is applied, a difficult problem would be presented if the Highway Department should erect a barricade along the improved highway, after the taking, preventing defendants from obtaining access to it, and defendants thereafter should claim severance damages for loss of access. The Department will have paid a substantial sum of money for defendants' right of access, and the question presented would be whether it should be required to pay more if it exercises the right it has already paid for. No such question could arise if the average land basis rule were used, with an award of severance damages, if appropriate.
In the event the front landrear land rule becomes a part of our jurisprudence, will it be applied to reduce the compensation due the landowner when only parts of the "rear land" are taken?
If the order of expropriation issued in this suit had stipulated that the land was being taken subject to the reservation in favor of the landowners of the right of access to the improved highway, I assume that the appraisals of the property taken would have been made with such a reservation, and that the award to the landowners would have been less. It seems illogical to me to impose the front landrear land rule which is unjust to start with, and which eventually may compel such a reservation in future orders of expropriation in order to get fair awards, when all parties can be assured of just and adequate awards, without a change of procedure, by using the average land basis rule.
In the instant suit the evidence indicates that the 17.142 acre parent tract was uniform in character, and that it could not logically be divided into different classes of land. Under those circumstances, I believe that the court should first determine the value of the entire parent tract, and that the award to defendants then should be based on the average per acre value of that tract, that is, the amount awarded should bear the same proportion to the total value of the parent tract as the number of acres taken bears to the total acreage. Defendants' appraisers have valued the property at $6,000.00 per acre, without access, and at $9,623.19 with access. I feel that the award for the taking should not exceed the higher per acre value, which would amount to an award of $19,065.14 for the land taken.[9] I thus would reduce the award for the property taken from $54,534.00 to the above mentioned figure. I *765 agree with my colleagues as to the amount of the additional award for improvements taken.
The evidence convinces me that defendants have sustained no severance damages as a result of the taking, particularly since their right of access has not been destroyed or impaired, and they still have the same amount of "front land" as they had before the taking. I think the court should inquire into and determine whether there has been a loss or impairment of access, however, in order to determine whether any severance damages to the remaining property have been sustained.
My principal objection to the majority opinion of course, is that the front land rear land concept of awarding compensation to the landowners has been used here, with the result that an unjust award has been made. I think the average land basis rule should have been applied. This dissent is much too lengthy, but since our court has rendered differing opinions on this issue which cannot be reconciled, I felt that it was appropriate for me to express my views fully.
For these reasons, I respectfully dissent.
NOTES
[1] Washington University Law Quarterly 310, 312 (1959)LimitedAccess Highways; Public Interests v. Access Rights of Abutting Owners; 11 Kansas Law Review 388 (1962-63)Control of Access by Frontage Roads, Police Power or Eminent Domain? 38 Nebraska Law Review 407, 412 (1959)Control of Highway Access; 27 Washington Law Review 111, 117 (1952)The Limited Access Highway; 20 Southwestern Law Journal 393, 395 (1966)The Landowner's Right of Access to the Abutting Street, a Damaging for the Public Use.
[2] For other discussions of the origin of access as a right of the abutting property owner, see: 16 Buffalo Law Review 603, 604, 634-635 (1966-67)Compensation for Loss of Access in Eminent Domain in New York, a Re-evaluation of the No-compensation Rule with a Proposal for Change; 3 Stanford Law Review 298, 300 (1951)Freeways and the Rights of Abutting Owners; 56 Northwestern University Law Review 587, 596 (1961)Frontage Roads, To Compensate or Not to Compensate; 12 South Carolina Law Quarterly 377, 381 (1959-60)Control of Highway AccessIts Prospects and Problems; 42 Minnesota Law Review 106, 112 (1957-58)Eminent Domain, Compensation for Partial Taking of Farm Land in Constructing Limited Access Highways; 13 Missouri Law Review 19, 31 (1948)The Limited Access Highways from a Lawyer's Viewpoint; 42 Minnesota Law Review 106, 114 (1957-58), supra; 34 North Carolina Law Review 130, 132 (1955-56); 35 Indiana Law Journal 508, 518 (1959-60)Right of Way Acquisition, Damage Problem Created by the Limited Access Highway; 33 Oregon Law Review 16, 35 (1953)Limiting Access to Highways; 47 Texas Law Review 733, 736 (1968-69) The Property Right of Access Versus the Power of Eminent Domain. See also State v. Department of Highways, 200 La. 409, 8 So.2d 71 (1942); Jones Island Realty Company v. Middendorf, 191 La. 456, 185 So. 881 (1939); Iowa State Highway Commission v. Smith. 248 Iowa 869, 82 N.W.2d 755 (1957); Petition of Burnquist, 220 Minn. 48, 19 N.W.2d 394 (1945); Adams v. Chicago B & N R. Co., 39 Minn. 286, 39 N.W. 629 (1888); Schnider v. State, 38 Cal.2d 439, 241 P.2d 1 (1952); Muhlker v. New York & H. R. Co., 197 U. S. 544, 25 S.Ct. 522, 49 L.Ed. 872 (1905); Standwood v. City of Maiden, 157 Mass. 17, 31 N.E. 702 (1892).
[3] For discussions of police power versus the right of eminent domain, see 1959 Washington University Law Quarterly 315 (1959), supra; DuPuy v. City of Waco, 396 S.W.2d 103 (Tex.Sup.Ct.1965); New Orleans Gas-Light Company v. Hart, 40 La.Ann. 474, 4 So. 215 (1888); 12 South Carolina Law Quarterly 404 (1960), supra; 14 Baylor Law Review 70 (1962)Eminent Domain v. Police Power as Related to the Abutting Owner's Right of Access; Bacich v. Board of Control of California, supra; Smith v. State Highway Commission, 185 Kan. 445, 346 P.2d 259 (1959); 11 Kansas Law Review 390 (1963), supra; 43 Iowa Law Review 264 (1958), supra.
[4] See 27 Washington Law Review 121 (1952), supra; 12 South Carolina Law Quarterly 393 (1960), supra; Warren v. Iowa State Highway Commission, 250 Iowa 473, 93 N.W.2d 60 (1958).
[5] See 38 Nebraska Law Review 149 (1959), supra; 20 Southwestern Law Journal 397 (1966), supra; 27 Washington Law Review 121 (1952), supra; Jones Beach Boulevard Estate v. Moses, 268 N.Y. 362, 197 N.E. 313 (1935).
[6] 47 Texas Law Review 751 (1969), supra; 38 Nebraska Law Review 417 (1959), supra; 56 Northwestern University Law Review 593 (1961), supra; 27 Washington Law Review 123 (1952), supra; Nelson v. State Highway Board, 110 Vt. 44, 1 A.2d 689 (1938); State v. Linzell, 163 Ohio St. 97, 126 N.E.2d 53 (1955); Pennysavers Oil Company v. State, 334 S.W.2d 546 (Tex.Civ.App.1960); Wilson v. Greenville County, 110 S.C. 321, 96 S.E. 301 (1918).
[7] I was the author of the majority opinions in the companion cases of State v. Bertrand, supra, and State v. LeDoux, supra, in both of which cases the front landrear land rule was applied. I explained in a footnote in LeDoux, however, that I had consistently disagreed with the front landrear land concept, but that I had voted for rehearings in the Landry and the Caillier cases, supra, that writs had been denied by the Supreme Court in both of those cases, and that I felt bound by the majority decisions in those cases. After the LeDoux and Bertrand cases were decided, however, our court rendered decisions in State, Department of Highways v. Medica, 257 So.2d 450 (La.App. 3 Cir. 1972), and State, Department of Highways v. Monsur, 258 So.2d 162 (La.App. 3 Cir. 1972), in both of which cases we specifically rejected the front landrear land concept of awarding compensation, and instead we applied the average land basis rule. Since our court has rendered opinions recently on this issue which are directly opposite to those rendered in the earlier cases of Landry, LeDoux and Bertrand, I no longer feel bound by the decisions rendered in those earlier cases.
[8] The order of expropriation does not recite that the right of access is reserved to the landowners. The land taken must be used only for highway purposes, however, and the project plans show that there will be free access to the improved highway. The award properly should be based on that premise. If it should be determined on that basis, then defendants would be entitled to recover damages if access to their remaining property is ever destroyed or materially impaired.
[9] Actually, the $6,000.00 per acre figure should be used here, since the landowners' right of access will not be lost or impaired. In using the higher per acre value, the defendants are being allowed to receive compensation for part of the value of the right of access, although they will suffer no loss or impairment of that right. The right of access does affect the value of the entire tract, however, so I prefer to include it in valuing the entire tract when the average land basis rule is applied.